If I hear first from Miss Smith. Yes. Good morning. May it please the court. I'm Jennifer Smith here along with Stephen Smith representing Jennifer Smith. This is a troublesome case, an unusual case, but everything that Professor Smith sued about down to her own salary has been admitted by Florida A&M. I'd like to walk the court through some key documents, explain the judicial mechanisms that we've advanced for relief, tell the court what we want the court to do and why. The first document I want to talk about, I want to talk about is the salary study that's dated August 2015. Miss Counsel, their position on that is sure, that's great, but you had access to exactly the same information from which that report was compiled. The salaries are public. You know who the faculty were. All you had to do is match them up. You could do the averages, you could do the median, just like anybody. Right, which I find unusual because we did that. We didn't have an expert, nor did they have an expert. But the salary study was a document that they claim was not in existence at the time of trial. But yet, they claim that it was work product, which was prepared in... You're talking about the 2004, the one that... No, no, no, I'm talking about the August 2015 salary study. Okay, that's a different issue. You've got one about the 2004, his testimony about he had looked at a list of the faculties and their salaries and the average was and the median was. But now you're talking about the 2015 post-trial. Right, I wasn't mentioning the 2004 study. I understand. My apologies. The document I'm talking about is the salary study dated August 2015 and it's document 125-2. The salary study dated August 2015 was in existence at the time of the lawsuit, which is key. First of all, FAMU says that it was not in existence at the time of the lawsuit. They said that it's irrelevant and they said that it's a subsequent remedial measure. But then they said it's also work product and that they could claim the work product privilege. They never mentioned it in discovery. Here's what I don't understand, though. They say that all of that salary information is accessible to anyone and that the list of faculty obviously is accessible to anyone. And all you had to do is go on the website, get the faculty member and match up gender with salaries. Right. The salary study is an analysis. We did that. In fact, I did that in a faculty meeting before. So you had the information. Right. Which is the point here is that. So in my complaint, in the complaint, I apologize. In the complaint, the complaint indicates that women were paid more than were paid less than men several times, all of which the university denied. Well, but so they can deny what they want to deny. But the point is, if you have the data that they assembled later. And and your complaint is they didn't give me that report. And that report is new evidence. And it shows that I was right and they were wrong. And you could have put that report together yourself. There's no legal mechanism for saying we're sorry you didn't go back and have another go at it. Well, first of all, the document was in existence. That's the dispute here. That's great. But you could have created the same document yourself. But we did. We did analyze it. Then you had it right. That's the point. Then put it in. But that's the point. But wouldn't this then be an admission against the party opponent? They're now saying, no, it's just it's just the hard data. They're not saying that shows discrimination. They're saying that the average salary of female faculty members of certain professor rank is this. The median is this. You could have you had all of that. But they were saying it based upon gender. I understand that. Right. So so you then you can then knowing that information and we and in the complaint, it says men are paid more than women, etc. Deny that. And then tell the court that you've done an individualized study of the salaries when you have it. And then argue in your motions for summary judgment the opposite of the information that you have. This will be this will crash our American judicial system. No, it won't. And I'll tell you one reason why is you can't bring up a summary judgment motion at this point. Once you go to final judgment at a trial, summary judgments moot. Right. And you had an opportunity to put all of your evidence before the jury, including the evidence you say was in that report. And if they got the evidence from publicly available sources, you could have gotten it and you could have put it in front of the jury. And the fact that you didn't. And if their report shows that they can't deny it, you could have told the jury they can't deny that you didn't. Doesn't mean that later you can come back and have a do over and try it again. The only thing that public records reveal, which is what we saw, is current salaries at the time. Right. We had an expert as well for damages. We we assessed our case indicated that showed that women are paid less than men. That report indicates, first of all, was never turned over. It was never there was never a work product. Privileges of product. We're not talking about that. We're at least I'm not. They may be. But what I'm talking about is that evidence was in existence. All you had to do is get it, put it in a chart and put it before the jury. Are you saying from public records? Their statement in their brief, which I don't understand you to contest, is that the salary information is available and accessible because they are a university that has that information available and accessible. You know who the faculty members are. You know which ones are women and which ones are men. Right. And all you've got to do is match the salary with the sex of the professor in that category. And we did that. OK, then you had the information that's in their report. We did that. Right. And that's what we based our complaint against. Right. That's how we drafted our complaint. Put it before the jury and the jury. But they denied that. I don't see how I understand what you're arguing, Your Honor. They denied that they discriminated based on sex. Well, when you look at. They didn't deny that this professor who's a woman makes this and this professor who's a man makes that. Yes, when you look at, for example, we say Dean Purnell hired in 2008 has consistently hired men at considerably higher rates than women, such that the salary structure has resulted in a substantial disparity between the male and female faculty members in each faculty category. That's needed to be an admission by their own data. We said the defendant ratified and affirmed each of the dean's hiring and salary recommendations. That should have been an admission. We said as of 22, when Plano filed an EEOC charge of discrimination, the male associate professors were being paid considerably more than female associate professors and more than some female male female full professors. That should have been an admission. We said male professors performed substantially similar work under similar conditions. That should have been an admission. We said that. Did you ask? Did you serve a set of admission requests on them and ask them to admit those? That was that. Those were allegations in our complaint. I know, but they can deny allegations in your complaint. Right. Well, they are also they can deny allegations in the complaint. They also alleged an affirmative to defense that they analyzed each individual salary. They did not do that when they finally did it in 2015. All women's salaries were increased up to $25,000, and mine was proposed to be equal to the male comparator I was suing that brought this complaint in the first place. I don't see how you can deny the factual allegations. The same thing with the discovery request, denying the discovery request. Every party that loses a lawsuit, not every party, but most parties that lose a lawsuit have denied something, either at the summary judgment stage or at the pleading stage or at trial, that the result shows, if it's result oriented, the result shows they should have admitted. But they're not guilty of misconduct because they didn't admit it. That's why we have trials. Right. But then this is a case that everything that Professor Smith alleged was accurate. The information from the retaliation to the salary to the equal pay was all denied. And post trial, it was revealed that, yes, they discriminated and they retaliated. This is an unusual case. And, yes, people want two bites at the apple. But the court, I think, is to allow this to be a litigation strategy would be wrong. I took up a bunch of your time with questions because I had the questions. But why don't you take a couple of extra minutes on the court there? Thank you. I wanted to just, we just discussed the salary study. But I also wanted to mention the December 25th, 2015, Jones memo, where they say that we are now in an inescapable catch 22 from now in her current promotion, denying it for the exact opposite reasons that we said in court. That was under Rule 60B-2 and 3. So that's a lower standard than 60D. And so here again, and then the interim dean there also says that we retaliated. We did not consider you on the record. This case should have never gone to trial. So we have a document that are hurry up, change the salaries. We have proposed salaries of all the women. I mean, it has broken the glass ceiling, but it should have never been a case that came to court. Let me ask you this, though. Eventually, the Jones recommendation was adopted because you are a full professor now. Right. But yes, I am. As of August 2016. But in that year, I was not evaluated. I was promoted on my prior records. The same thing I was saying in trial. So it's clear that the witnesses falsified, testified falsely in court. And to me, you know, what's disturbing about this case is that it will chill women from advancing equal pay rights. It will. The basis, the foundation of our American judicial system has to be based on truth. Accurate facts. Honesty. Otherwise, we don't have one. Here, the retaliation I complained about, admitted. The equal pay I was complaining about, admitted. That my salary should be equal to Jeffrey Brown. They admitted in proposed salaries document 133-1, page 30. And if the court has no further questions, thank you. What remedy are you seeking in this case? Because you are now a full professor. Are you seeking back pay and attorney's fees? Back pay, attorney's fees, and even with the new salaries that they proposed, the memo that's in the file indicates that they took all the high paid men out. And they took the high paid men out so that our salaries still are not equal. And the problem with this case is that when they did all the, I'm going to call it hiding and falsifying information, they then have been able to revise the salaries as they deemed fit. But they're still not equal. So they took the high paid men out, called them outliers, and then adjusted the salaries for the women. They're still not equal. Thank you, your honor. Thank you. Ms. Ward. May it please the court, my name is Teresa Ward and I'm here representing Florida A&M University. This has been a very difficult case for the university to stay within the lines because this record has consistently been peppered with things that happened after trial and with a certain amount of half-truth that happened during the trial. Let me tell you the only thing that bothers me about this case, and it really might not affect the way we end up deciding it because so much of what the plaintiff contends in this case was not objected to. So we have to review it under the plain arrow standard. Everything else we review under the abuse of discretion standard. But it does seem to me that there was some inconsistency in the university's promotion policy. Can you address that and tell us because of that, would that have made any difference? For example, going back to Dean Jones, when he responded to the committee's decision with a memo and he highlighted the committee's inconsistency in evaluating the plaintiff's scholarship and he pointed out that in 2010 it reviewed draft articles by the plaintiff and in 2013 the committee refused to review those same articles even though they'd been published between the two applications. That's just one example, but that's what I'm talking about. Would you admit that there were inconsistencies and if there were, would it make any decision in the way we decide this appeal? Well, I really don't think it should because Dean Jones, he was the interim dean I believe, testified at trial. And these things happened afterwards. These things all happened afterwards. And they might be impeaching of testimony. They might be anything, but they're not after discovered evidence. It didn't even occur until after the trial. Second of all, the committee did not, the law school committee vote was not. Which goes to the 60B of why it would not be newly discovered evidence. It would not be under the BetterBox case which I cited in my brief. It has to be something that's in existence at the time of the trial. Otherwise, there's just no end to it. There's no finality. These things could be opened up and opened up and opened up. And I'm not saying they shouldn't be for fraud because fraud is something that the wronged party is never going to discern. And of course, fraud doesn't have a statute for that reason. There's no evidence of fraud in this case. But there's no evidence of fraud in this case. And in fact, the university-wide committee, the usual standard procedure is that the law school committee reviews the application and votes on it, the university-wide votes on it, then the provost, then the president. When the actual promotion that we're talking about now in 2015 happened, that didn't happen. University-wide committee did not review it. The committee voted against it. The provost just entered the promotion. So, yes, there are some inconsistencies all across the board. But bottom line is those don't really affect, in your opinion, discipline. They don't. And there's numerous cases we didn't go into about how the inner workings of how people are promoted is not something that the courts like to get into because there's a wide variety of discretion that goes into them, including collegiality and the ability to work and play well with others, all kinds of records and things like that. I would like to take exception to one thing. I don't believe that we claimed that the salary study was a work product. I believe that at some point we did mention that perhaps the infamous list of 2004 professors we had put together from personnel files and had given it to the plaintiff as a trial exhibit. And we might have said that was work product because we did put it together. There are a whole lot of things that have gone on since this appeal was filed that we're just not really fairly able to cross-examine. There are declarations filed in there. And by the way, there's a couple from Nathaniel Friends who was on the Rule 26 witness list. He could have appeared at trial. We could have cross-examined him. But unfairly, to which we had a real dilemma about whether or not to object and pepper the record with more defensive documents about what happened in discovery, but we didn't, we could have asked him questions about his declaration. Ms. Smith has peppered the record with more declarations post-trial, trying to retry the case. That's really not fair. That's the reason the record is closed. And what is presented to this court and what is reviewed by this court is the abuse of discretion standard and what was presented to the lower court. That's only fair. To supplement the record in this fashion is extremely unfair. And there's a couple of things that were actually done wrong. For example, under tab 104, which is the email where Smith alleges that the day before trial, the plaintiff was supplied with a list of 2004 professors as a demonstrative. We actually had receded all of our bait-stamped exhibits that we were going to use at trial on June 12th. And I can make a proffer to the court of copies of that if necessary. But that was not sent just the day before trial. It was given five weeks before trial. Smith has added into the record, because discovery is not generally filed, plaintiff's first request for production of documents. One of those pages is omitted, and that is the very page that says we're only asking for things from 2007 forward. I think that's material. I can proffer the entire document. Things that the motion in limine kept out of the trial have been presented as if they are evidence before this court, and this court is the trier of fact. That's not fair. The ABA report, the PAR debacle about Smith trying to raise her own salary by a fax. These things were not presented to the jury for very good reason. And it's not fair to treat this court like the trier of fact again. I would like to just run through a few of these things. Larry Robinson's testimony. When he testified about being the provost in 2004, he only had seven or eight people to remember. He remembered that Ms. Smith was the highest paid assistant. He also identified her employment contracts. He identified the letter offering her the position as visiting assistant professor. He also identified the letter from Dean Looney saying we offer you this. Oh, and there was another job description of position that was identified into evidence that's signed by Dean Looney and signed by Robinson that said visiting assistant professor. This was to establish the circumstances under which Ms. Smith was hired and her salary as the highest paid person that year. He remembered that. He didn't testify from a list, and the case doesn't hang on the list. There was a lot of other evidence because we had the contracts. We had the personnel file. On cross-exam, this idea of a list came out. I'm not quite sure if he was referring to just the data because he was the provost or whether he was referring to our trial exhibit. But that came out on cross-exam that he had referred to a list. We didn't introduce that. The plaintiff never asked for that list, did she? They asked for documents from 2007 forward. Yes, but we had provided as a trial exhibit because I think maybe depending on how testimony goes, we might have written on the board because they were even numbers. If you look at them, they were 885, 75,000, 75,000. They were not that hard to recall. Plus, it's impossible to actually conceal who those people were. There were only seven or eight people there at that time. It's not a fraud. It couldn't possibly be concealed. Those people walked the halls with Ms. Smith. They were known to her from 2004. The allegations about closing arguments. The allegation that Maria Santoro testified about evidence not on the record. She made a statement to the jury, and this was quoted in several briefs. She said that's what these records are saying. Well, she was referring to the employment contract. And there's three or four things, including the personnel file, that show that Ms. Smith applied for the position of visiting professor and signed off on her employment contracts and so on. So those are the records. Ms. Santoro didn't make this up. Smith claims in her brief that FAMU relied heavily on this list of salaries. That's not true. We relied on Herb Bailey, who wrote the checks and who knew what everyone's contract said, and Dr. Robinson. Smith says we used improper comparators. At the pretrial conference, we really tried to narrow down the comparators. And Judge Hinkle said, no, everything is fair game, going all the way back to the beginning. And, in fact, Judge Hinkle wrote the jury instructions and presented them to us the day before the end of trial. And Judge Hinkle wrote the verdict form.  It's in the record. No objections to any of it. When Smith accuses Santoro a couple of times of saying no list to the court, I want to clarify that because that was not a lie to the court. At that time, evidence had closed. No list had been introduced into evidence before the jury. It would have been highly improper to offer one back then without, again, without the opportunity to cross-examine or to look at it. Smith says in her brief file 1231 that the salary study was an involuntary measure. Not so. It was done by another division of the college, not the college, the university. Honestly, I don't think anybody there knew it was pending. I think it was done outside, but it wasn't completed until after the trial. And it wasn't done, it was purely a voluntary measure. The EEOC did not swoop down and make any kind of complaint. Let me see. The source documents, as the court has astutely noted, were all available all the way back to the beginning of time. And actually, if we look through the declarations that Ms. Smith has entered into the record since the trial, we will see that she had salary information going back to 2001 and 2002. There's no fraud of any kind in this court. In this case, I think the court can recognize that. And at this point, I will not belabor any of this anymore unless you have further questions. We don't. Thank you, counsel. Mr. Smith. Thank you. Good morning, Your Honors. Just some notes on what was said in conclusion. First of all, I'd like to point out, Chief Judge Carnes, when you were questioning Ms. Smith, co-counsel, about the salary study from August 2015, and you asked about the data being readily available through a public records request. Judge, we do not deny that the salaries that were in existence were public records and that they could be easily compiled by Professor Smith. In fact, Professor Smith had compiled this evidence. What we did not have is we did not have the conclusions. What we were given initially was that Florida A&M said that the differences in salary were due to inversion and all kinds of other reasons or experience that had nothing to do with gender. When they concluded in their August 2015 study was, after trial was, oh no, these actually are problems that are based on the gender between the males. The report actually says we have discriminated against the female professors because of their sex and that's the reason for these salary disparities. I didn't understand that's what the report said. I thought the report said there are disparities and we need to get rid of them. That doesn't mean the disparities are because somebody intentionally discriminated based on sex. Okay, Judge, I will agree with that contention. However, it just so happens that every one of the disparities happened to be sexually related. So all the people who were given increases were women and none of the men were decreased and all the outliers were excluded that were men. That doesn't change their position that there's a reasonable explanation for it. And Judge Hinkle's post-trial order says the jury found her salary was lower than that of male professors with equivalent jobs but the reason was not gender. And I agree with that. However, after trial, when they came out with their salary study, we're of the belief that they're admitting that gender was in fact one of the causes. But it doesn't say that. I mean, you could want just as a policy to look good and make sure you didn't inadvertently do anything for everybody's salary to be the same in the same category or subcategory position. Male, female, everything be the same. But you're not required to do so. And the fact that after trial they said that's what we're going to do doesn't mean that not doing it earlier was based on sex discrimination. It does not mean that it was based on sex discrimination. We just find it odd that all of the salaries that needed to be raised just all happened to be women and there is no other reasoning behind keeping those women in the salaries. Which supports your position that this would have been good for us to show the jury. But then their position is you could have gotten all this information and done it yourself. And Judge, we did in fact have all of that information and we argued all of that information but the argument that was made by the defendant, by Florida A&M, was that You wanted their admission. But you want to put to the jury what they have found themselves that they've discriminated. At least try to argue to the jury from that report. But the report came after the trial was over. And the report, the final version of the report did come after the trial was over? That's the one you wanted. But the bottom line is that the other reports, which had all of the same information, were well before trial and oddly enough, those reports came to an exact opposite conclusion with the same data and then all of a sudden in August of 2015, they admit that yes, there are problems with every woman who is being paid by Florida A&M compared to every man and we need to correct this. What we are investigating is how they could possibly come to that conclusion after the trial ended when they had the same exact documentation in two drafts before the trial ended and the exact same information gave them a conclusion that oh well, this isn't based on gender. This is based on any and every other thing other than gender. We found that to be very disingenuous and we think that the record is clear that everything that was questionably produced or discovered after trial were things that inhibited or worked against Florida A&M. And that just doesn't seem to us to be happenstance or coincidence. It seems like an overt attempt to make sure that documentation that should be discovered, that should be handed over, was not given to opposing counsel, to the plaintiff, because you knew it hurt your case and you knew it showed everything that she had pleaded in her filings. Of course, an unintended consequence of your position is going to be that the university will never be able to, at its own charitable impulse or cautious impulse or let's make sure we're 100% fair impulse, will never be able to do what it did in this case. Because you'll always follow 60B or D and say look, they admitted something contrary to what they did at trial. So it'll be, the effect will be, you know, the rule against evidence of remedial measures was mentioned somewhere. The point of that is you don't want to discourage people from solving perceived problems even if they don't have any legal liability because they'll be threatened with legal liability if they do it. And somebody will say, aha, that's an admission you've discriminated in the past. I mean, that doesn't bar your argument, but it's an unintended consequence, I would think. It could be an unintended consequence, Judge. However, I feel that when Florida A&M was first apprised of all of these discrepancies years prior to the suit being filed, years prior to going to trial, they could have and they should have checked it then to find out, to make sure. Then you don't have it being a subsequent remedial measure in which you have 60B problems going forward because you didn't litigate the issue. What you did is you corrected it when you found out it existed, as you should have done, because that's the equitable thing to do. And to give them a pass because of what may happen in the future doesn't seem fair because when, honestly speaking, they should have done this as soon as it was brought to their attention. Well, how is it possible that every single female at every level, from full professor to assistant professor to associate professor, is paid substantially less than every man? When does it dawn on them to say, let me investigate this. Let me not make excuses. And then, of course, at the end of trial, you want to say, oh, yeah, well, this does, in fact, exist. I thought at one time, and it was before 2015, of course, but I thought at one time the plaintiff was the highest paid assistant professor. The plaintiff was the highest paid assistant professor. However, however, we don't think that she was really an assistant professor. She was actually an associate professor and she was closely underpaid as far as the associate professors were concerned. But her title was assistant professor, was it not? The title was listed on a document as an assistant professor. However, that that was in dispute and it never should have been. And that's why they said at trial, oh, well, unbeknownst to us and we have absolutely no idea how it happened. She all of a sudden became an associate professor, but she was never given the pay increases, even though it went back to 2004. We were never given the pay. She was never given the pay increases that she was entitled to as that associate professor. And the whole idea is what they're arguing is basically that Professor Smith just made herself. She just gave herself a different job title and then the winning the computer system for the school. And all of a sudden it happened. There's no explanation for that other than the fact that that's what she was supposed to be from the get go. I probably shouldn't have asked that question because now we are re-litigating the trial. But thank you for your argument. We'll take that case under submission along with the others and stand in recess until tomorrow morning. Thank you, Your Honors. Thank you.